WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>Omar Ruiz-Perez,<br><br>    Defendant. | CR-11-561-TUC-JGZ (DTF)<br><br>**ORDER** |

On October 5, 2011, Magistrate Judge D. Thomas Ferraro issued a Report and Recommendation ("R&R") (Doc. 61) in which he recommended that Defendant's Motion to Suppress Evidence (Doc. 36) be denied. The R&R provided that any party could file written objections within fourteen (14) days after being served with a copy of the R & R. On October 31, 2011, Defendant filed his Objections to Magistrate's Report and Recommendation (Doc. 70); the government filed a Response to Defendant's Objections on December 15, 2011. (Doc. 74.) After review of the Objections and Response, the Court set this matter for evidentiary hearing. (Doc. 82.) Additional evidence was heard on February 15, 2012. (Doc. 93.) At the evidentiary hearing, the parties also submitted a Stipulation of Facts. (Doc. 94.)

**STANDARD OF REVIEW**

The Court reviews *de novo* the objected-to portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The Court reviews for clear

1 error the unobjected-to portions of the Report and Recommendation. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *see also Conley v. Crabtree*, 14 F.Supp.2d 1203, 1204 (D. Or. 1998).

**FACTUAL BACKGROUND**

The factual background contained in Magistrate Ferraro's R & R (Doc. 61) is uncontested.[1] As such, it is adopted by reference herein.

The Court adopts the Stipulation of Facts and finds that: (1) the primary purpose of the I-19 Immigration Checkpoint is immigration and (2) at the time Agent Kouris signaled Agent Thornton to stop Defendant's truck, traffic at the checkpoint was being flushed as instructed by the checkpoint supervisor.

Based on the February 15, 2012 testimony of Border Patrol Agent Greg Smith, a supervisor at the I-19 Checkpoint, the Court further finds as follows. The checkpoint has three lanes, with one lane designated for commercial trucks. Approximately one and one-half miles before the checkpoint, a sign indicates that traffic should slow down. As vehicles approach the checkpoint, the vehicles are divided into three lanes, each marked with a stop sign. Each vehicle is stopped for a short primary inspection lasting approximately 20 seconds. Agents have discretion to wave vehicles through the primary inspection without stopping them. Agents may also refer vehicles to secondary inspection if they suspect an immigration violation.

---

[1] Defendant did not challenge any specific factual finding of the Magistrate, but included in a footnote in the "Facts" section of his Objections to the Magistrate's R&R stating "to the extent these facts differ from the Magistrate's findings, Mr. Ruiz-Perez objects to the findings of fact." Defendant bears the burden of raising specific objections to the Magistrate's factual findings. *See Thomas v. Arn,* 474 U.S. 140, 142 (1985); *Jones v. Wood*, 207 F.3d 557, 562 n. 2 (9th Cir. 2000) (failure to object to a magistrate judge's recommendation waives all objections to the judge's findings of fact.). The Court declines to bear the burden of identifying facts to which Defendant may object and concludes that Defendant has not contested Magistrate Ferraro's factual findings. The Court further notes that in the Stipulation of Facts filed by the parties on February 15, 2012, the parties specifically accepted the findings of facts set forth in Magistrate Ferraro's R&R at page 2, paragraphs 1-2 and page 5, paragraph 3. (Doc. 94, ¶ 1.)

The United States Border Patrol has an obligation to run a safe checkpoint and therefore will occasionally engage in a "flush" of vehicles through the checkpoint. A supervisor determines when a flush is necessary due to traffic back-up, inclement weather or traffic accidents. During a flush, agents wave traffic through the checkpoint without routinely stopping vehicles. A flush may involve all three lanes at the checkpoint, or only one or two lanes. The checkpoint is operational even when a flush is occurring. Agents remain at their posts. Agents continue to monitor traffic and may stop a vehicle for immigration inspection if they observe some indicia of smuggling, such as when a vehicle passing through the checkpoint appears to be a rental car or a driver appears nervous. The supervisor determines when to end a flush based on when the safety hazard necessitating the flush has been resolved.

Although the primary purpose of the checkpoint is to inspect for immigration violations, the checkpoint encounters 300-400 narcotics smuggling cases per year. These cases usually involve suspected transportation of bulk quantities of narcotics. All Border Patrol agents, including the agents staffing the checkpoint, are trained and cross-designated to investigate immigration and narcotics crimes.

**ANALYSIS**

Defendant objects to the Magistrate's R & R (Doc. 61) on several grounds: (1) the Magistrate applied the incorrect legal standard regarding the degree of suspicion required for the stop; (2) the Magistrate's finding that the stop was lawful is not supported by sufficient evidence; (3) the Magistrate erred in concluding that the continued detention was lawful; and (4) the Magistrate failed to recognize that the search exceeded the scope of consent. After review of Defendant's objections and considering the further evidence, the Court adopts the Magistrate's R&R as modified by this Order.

*1. Applicable Legal Standard for the Stop*

"The parties agree that a brief, suspicionless seizure at a fixed immigration checkpoint complies with the Fourth Amendment if it is limited to a few brief questions about immigration, the possible production of immigration documents and visual inspection of the

vehicle without a search." (Defendant's Reply to Government's Response to Defendant's Motion to Suppress Evidence, Doc. 44, p. 1, citing *United States v. Preciado-Robles,* 964 F.2d 882, 884 (9th Cir. 1992).) The I-19 Checkpoint is a fixed checkpoint. Defendant's vehicle was stopped at the checkpoint and Defendant was asked a few brief questions relating to immigration.

The Magistrate Judge, however, found that an "articulable suspicion or a minimal showing of suspicion" was required to stop the Defendant's truck at the I-19 Checkpoint based on Agent Kouris's subjective beliefs about Defendant's vehicle. The Magistrate found that Agent Kouris directed Agent Thornton to stop Defendant's vehicle because the vehicle fit the description provided in an ICE lookout for certain trucks suspected of smuggling drugs. Because the checkpoint was being flushed, the Magistrate Judge reasoned that Defendant would not have been stopped at the checkpoint but for the drug lookout. The Magistrate Judge concluded that although Defendant could have been stopped for an immigration inspection without individualized suspicion, the agent's subjective intent to investigate a suspicion of drug trafficking while the checkpoint was being flushed required an articulable suspicion or a minimal showing of suspicion. (Doc. 61, pg. 6.) Defendant contends that this legal standard is incorrect, and that in fact a "reasonable suspicion" is required. The Court disagrees with the Magistrate Judge and Defendant, but concludes that the stop was nevertheless constitutional.

The Ninth Circuit applies a two-step analysis in evaluating the constitutionality of a stop at an immigration checkpoint. First the court must "determine whether the primary purpose of the [checkpoint] was to advance the general interest in crime control. If it is, the stop is invalid under the Fourth Amendment." *United States v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009) (internal quotations and citations omitted). Second, "[i]f the checkpoint is not *per se* invalid as a crime control device, then the court must judge the checkpoint's reasonableness, hence its constitutionality, on the basis of the individual circumstances." *Id.* (internal quotations and citations omitted).

There has been no allegation that the I-19 Checkpoint was intended to serve as a general crimes checkpoint. The parties agree that the primary purpose of the I-19 Checkpoint is immigration. As the Ninth Circuit noted in *Fraire,* the Supreme Court has upheld the constitutionality of permanent immigration checkpoints. *Fraire,* 575 F.3d at 932 (*United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976) upheld immigration checkpoints because primary purpose was not detection or ordinary criminal wrongdoing). In *Martinez-Fuerte,* the Supreme Court reasoned that although a stop at a permanent immigration checkpoint constitutes a seizure within the meaning of the Fourth Amendment, given the strong public interest in enforcing immigration law and the minimal intrusion on privacy, such a seizure is constitutional even absent reasonable suspicion about a vehicle's occupants. *Martinez-Fuerte*, 428 U.S. at 556-60. Thus, a stop for brief questioning routinely conducted at permanent immigration checkpoints does not require a showing of individualized suspicion. *Martinez-Fuerte*, 428 U.S. 543, 566 (1976).

As the immigration purpose of the I-19 Checkpoint is distinguishable from the general interest in crime control, the checkpoint is not *per se* unconstitutional. Therefore, the Court next looks to the reasonableness on the basis of the individual circumstances. Factors to consider in the reasonableness analysis include: the gravity of the public concerns served by the seizure; the degree to which the seizure advances the public interest; and the severity of the interference with individual liberty. *Fraire*, 575 F.3d 934-35. Applying these factors, the Court concludes that the stop of the Defendant at the I-19 Checkpoint is reasonable, and therefore constitutional.

The first two factors are easily met. Immigration checkpoints such as the one at issue in this case serve a public interest in securing the border. The Supreme Court and the Ninth Circuit have repeatedly recognized the high public interest in border security. *See, e.g. United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (finding that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border); *see also United States v. Cortez-Rocha*, 394 F.3d 1115, 1123-24 (9th Cir. 2005) (describing the nation's "compelling" interest in border security). The degree to which a checkpoint serves

the public interest in securing the border may be measured "by the relationship of the checkpoint to its objective, rather than by any measurable results, or by any results period." *Fraire*, 575 F.3d at 934 (citation omitted). While the parties did not introduce evidence regarding the statistical effectiveness of the I-19 Checkpoint in identifying and arresting illegal aliens, the Ninth Circuit has held that a permanent immigration checkpoint which carries out a program of routine stops for brief questioning is effective in supporting the public's substantial interest in controlling the flow of illegal aliens. *See United States v. Vasquez-Guerrero*, 554 F.2d 917, 919 (9th Cir. 1977) (citing *Martinez-Fuerte*, 428 U.S. 556 at 558). Agent Smith's testimony establishes that the I-19 Checkpoint is a typically-functioning permanent immigration checkpoint and the parties do not dispute that the primary purpose of the checkpoint is the investigation of immigration crimes.

The third factor - the severity of the interference with individual liberty - is "gauged by the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, and by the subjective intrusion, measured by the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Fraire,* 575 F.3d at 934. The objective intrusion of the I-19 Checkpoint is minimal. In *Martinez-Fuerte,* the Supreme Court emphasized that the scope of a stop at a primary immigration checkpoint is limited to a few brief questions, the possible production of a document indicating the detainee's lawful presence in the United States, and a "visual inspection of the vehicle ... limited to what can be seen without a search." *Martinez-Fuerte*, 428 U.S. at 556. There is no evidence that Agent Thornton's stop of Defendant's vehicle at the I-19 Checkpoint exceeded the ordinary scope of an immigration inspection. Agent Kouris told Agent Thornton to take a look at Defendant's truck because there was an old lookout from ICE on the trucking company. Agent Thornton testified that being told to do an inspection on a vehicle coming through the checkpoint means looking at the vehicle and the individuals in the vehicle to see if anything looks out of place or inconsistent, if it is weighed down or if there are people trying to hide in the vehicle. Agents ask the occupants of the vehicle if they are U.S. citizens and examine

1 documents. If the agents don't see anything that warrants further investigation, the vehicles
2 are sent on their way.

3 Having been directed by Agent Kouris to do an inspection of Defendant's vehicle,
4 Agent Thornton stopped Defendant's vehicle in primary inspection and asked Defendant if
5 he was a United States citizen, if anyone else was in Defendant's vehicle, what cargo he was
6 carrying, and if he had a bill of lading. (TR 41.) After reviewing the bill of lading, Agent
7 Thornton asked Defendant if the agents could look in the back of the truck. When Defendant
8 assented, Agent Thornton directed Defendant to the secondary inspection area. (TR 41.)
9 Only a minute to a minute and a half had elapsed from the time Agent Thornton stopped the
10 truck until he directed Defendant to secondary inspection.[2] (TR 51.) *See Martinez-Fuerte*,
11 428 U.S. at 546-47 (average delay of three to five minutes without individualized inspection
12 held reasonable). There was minimal objective intrusion in the stopping of Defendant's
13 truck.

14 The subjective intrusion of the I-19 Checkpoint as measured by the fear and surprise
15 engendered in law-abiding motorists by the nature of the stop is minimal. The Supreme Court
16 has found that the subjective intrusion from a checkpoint stop is significantly less than other
17 types of seizures, such as random stops. *Martinez-Fuerte*, 428 U.S. at 558. Here, as in
18 *Martinez-Fuerte*, the checkpoint is clearly marked. Signs prior to the checkpoint warn
19 drivers to slow down. Each vehicle is stopped for a short primary inspection or waved
20 through. The checkpoint is staffed with uniformed Border Patrol agents. *See Fraire*, 575

---

[2]Defendant's testimony largely corroborated Agent Thornton's testimony: Defendant testified that Agent Thornton asked him what he was hauling, what kind of produce he was hauling, whether anyone else was in the trunk, where he had picked up his load, where he was headed, and if he could review Defendant's bill of lading. (TR 91-92.) After reviewing Defendant's bill of lading, Agent Thornton asked Defendant if he could look in the back of Defendant's truck and, when Defendant replied that he "didn't care," Agent Thornton directed him to secondary inspection. (TR 95.) Defendant testified that approximately 7 to 10 minutes passed from the time he was stopped and the time he was referred to secondary. The Magistrate found Agent Thornton's testimony more credible than Defendant's testimony on this issue. (TR 51.) As the Magistrate observed, it is unlikely that agents would stop a car for 7 to 10 minutes at a primary inspection point when they had just been issued a directive to flush traffic in order to alleviate delay.

F.3d at 934 (subjective intrusion minimal where checkpoint accompanied by signs announcing it, rangers operating it were uniformed and all approaching vehicles were stopped). Although the traffic lanes at the I-19 Checkpoint were being flushed at the time that the Defendant's truck was stopped, this would not significantly increase the level of fear and surprise to a law-abiding motorist. During a flush, the checkpoint is still operational. Agents remain at their posts and continue to monitor traffic. Supervisory Agent Smith testified that, even during a flush, agents may stop vehicles bearing indicia of smuggling for immigration inspection. Defendant's vehicle was stopped pursuant to this standard practice. Once Defendant's vehicle was stopped, Agent Thornton followed standard procedure, detaining Defendant for less than two minutes in order to ask Defendant routine immigration inspection questions. There is no evidence that the agents deviated from a routine procedure such that the stop of Defendant's vehicle was an abuse of power.

Agent Kouris' subjective belief that Defendant's vehicle may be smuggling drugs does not affect the analysis the reasonableness of the stop. Although subjective intent has been considered in evaluating the subjective intrusiveness of a checkpoint stop, the key consideration is the subjective belief of the traveler, not the officer. S*ee e.g. United States v. Hawkins,* 249 F.3d 867, 874 (9th Cir. 2001) (stating "in some instances, the failure to stop every vehicle could raise concerns over subjective intrusiveness," but finding no Fourth Amendment violation where Defendant was not treated differently from other drivers and no law-abiding motorist would have been unduly surprised or afraid because of this stop).[3] In fact, the Supreme Court has indicated that some discretion and motive is inherent and permissible in routine checkpoint operations. For example, in *Martinez-Fuerte*, the Court

---

[3]Subjective intent has also been considered in evaluating the programmatic purposes of a checkpoint. S*ee, e.g., United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993) (suggesting that an agent's subjective intent could be relevant if evidence suggested that narcotics training of Border Patrol agents led to a practice of searching for illegal drugs under the pretext of searching for undocumented aliens). However, that consideration is not relevant here as there has been no allegation that the I-19 Checkpoint was operating as a general crimes checkpoint or that it was anything other than a checkpoint with the primary purpose of immigration inspection.

rejected concern that a standard procedure which refers only a small percentage of cars to secondary inspection is stigmatizing, even when the referrals are based at least in part on apparent Mexican ancestry. 428 U.S. at 560. The Court reasoned: "As the intrusion here is sufficiently minimal that no particularized reason need exist to justify it, we think it follows that the Border Patrol officers must have wide discretion in selecting motorists to be diverted for the brief questioning involved." *Id*. at 564. Similarly, in *United States v. Soto-Camacho*, 58 F.3d 408 (9th Cir. 1995), the Ninth Circuit approved the use of a temporary immigration checkpoint even though the decision as to when the checkpoint would be operated was based in part on drug intelligence. *Id.* at 412. The Court found the stop of the vehicle permissible because "the stop and search had an 'independent administrative justification,' and 'did not exceed in scope what was permissible under that administrative justification.'" *Id.*

In sum, the gravity of the public concerns served by the I-19 Checkpoint are high, the checkpoint was reasonably related to these concerns, and the severity of the interference with individual liberty was minimal. Therefore, the stop of the Defendant's truck at the I-19 Checkpoint was reasonable. Agents were not required to have individualized suspicion to stop Defendant's vehicle at the checkpoint for routine immigration inspection. As the I-19 Checkpoint is a lawful immigration checkpoint, agents were permitted to stop Defendant's vehicle at the primary inspection area, even if it was upon a subjective belief of drug trafficking, and conduct an inspection for the purpose of detecting immigration violations.

*2. Articulable Suspicion*

Defendant challenges the Magistrate Judge's finding that the agents' decision to send Defendant's vehicle from primary to secondary inspection was supported by a minimal showing of articulable suspicion. (Doc. 61, pgs. 7-8.) The Court concludes that the Magistrate's application of the articulable suspicion standard to the referral to secondary

inspection is misplaced.[4] A vehicle may be referred from primary to secondary inspection for further brief questioning "in the absence of any individualized suspicion..." so long as agents continue to operate within the scope of a legitimate immigration stop. *See United States v. Soyland,* 3 F.3d 1312, 1314 (9th Cir. 1993); *Barnett*, 935 F.2d 178, 180 (9th Cir. 1991). In the present case, Agent Thornton's decision to refer Defendant to secondary was routine: after asking Defendant standard immigration inspection questions, he asked Defendant for permission to look into the back of his truck. Upon receiving Defendant's consent, Agent Thornton referred Defendant to secondary, where Defendant's vehicle was scanned by an x-ray truck. At this point, agents could have objectively believed that Defendant's truck, based on its size, contained evidence of alien smuggling such that Defendant was committing an immigration violation. Agent Smith testified that the agents stationed at secondary who facilitate the x-ray inspections of trucks referred there are trained to identify both narcotics and people in an x-ray image. There is no evidence that Defendant's referral to secondary deviated from standard inspection practice.

If an agent continues the detention beyond the scope of an ordinary checkpoint stop, whether solely because of drug-related concerns or because of a subjective belief that some other criminal offense has been committed, an articulable suspicion is required.[5] *See United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991). However, even if the Court were to conclude that the referral of Defendant's vehicle to secondary inspection exceeded the scope

---

[4] Magistrate Ferraro's conclusion relied on *United States v. Lewis*, 2011 WL 2692914 (D. Ariz. July 12, 2011), which in turn relies on *United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991). *Taylor* applies the articulable suspicion standard to continued detention at secondary inspection, not the decision to refer a vehicle from primary to secondary. In *Taylor*, the parties did not dispute "the propriety of the initial stop nor that referral to the secondary station was justified by the nervous behavior of the vehicle occupants. The heart of their disagreement lies in the legality of the actions that took place after the trunk of the car had been searched and the immigration purposes of the stop had been served." 934 F.2d at 220. *Lewis* appears to have incorrectly applied *Taylor* to a referral to secondary inspection.

[5] As stated in sections 1 and 3, the stop and detention of Defendant's vehicle was within the scope of an ordinary immigration inspection.

of an ordinary immigration inspection and was akin to the continued detention at issue in *Taylor*, the stop would be supported by an articulable suspicion. As the Magistrate concluded, at the time Defendant's vehicle was referred to secondary, Agent Thornton had noticed numerous indicia of alien or drug smuggling: an ICE lookout, a high DOT number, ghost-lettering and handwritten bills of lading. *See, e.g. Taylor*, 934 F.2d at 221 (nervousness alone is sufficient to support a finding of articulable suspicion). Accordingly, Defendant's objection is overruled.

### 3. *Scope and Duration of the Detention*

Defendant challenges the Magistrate's finding that Defendant's detention at the primary and secondary checkpoints was within the scope and duration of a permissible checkpoint stop. The scope of a stop at a primary immigration checkpoint is limited to a few brief questions, the possible production of a document indicating the detainee's lawful presence in the United States, and a "visual inspection of the vehicle ... limited to what can be seen without a search." *Martinez-Fuerte*, 428 U.S. at 556. Beyond this limited intrusion, continued detention must be supported by probable cause or consent to search. *Id.* at 567. However, upon a showing of "minimal, articulable suspicion," an officer may prolong an immigration checkpoint stop for "brief further delay," such as the 60 seconds necessary to conduct an inspection by a narcotic-detection dog. *See United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991).

In the present case, Agent Thornton credibly testified that when he stopped Defendant at the primary inspection area, he asked him if he was a United States citizen, if anyone else was in Defendant's vehicle, what cargo he was carrying and if he had a bill of lading. (TR 41.) After reviewing the bill of lading, Agent Thornton asked Defendant if the agents could look in the back of the truck; when Defendant assented, Agent Thornton directed Defendant to the secondary inspection area. (TR 41.) Defendant's testimony largely corroborated Agent Thornton's testimony: Defendant testified that Agent Thornton asked him what he was hauling, what kind of produce he was hauling, whether anyone else was in the trunk, where he had picked up his load, where he was headed, and if he could review Defendant's bill of

1 lading. (TR 91-92.) After reviewing Defendant's bill of lading, Agent Thornton asked
2 Defendant if he could look in the back of Defendant's truck and, when Defendant replied that
3 he "didn't care", Agent Thornton directed him to secondary inspection. (TR 95.) Agent
4 Thornton testified that only a minute to a minute and a half had elapsed from the time he
5 stopped the truck until he directed Defendant to secondary inspection. (TR 51.) Even if that
6 additional minute were not attributable to Agent Thornton's routine inspection, it would be
7 permissible pursuant to *Taylor*, given the articulable suspicion discussed in section 2.

### 4. Scope of Defendant's Consent

The Magistrate concluded that the x-ray of Defendant's truck was within the scope of his consent to search because a reasonable person lawfully engaging in commercial trucking would find an x-ray scan far less intrusive than a physical search and because Defendant was free to withdraw his consent at any time. Defendant challenges both of these findings.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994). Defendant challenges the Magistrate's finding that an x-ray is less intrusive than a physical inspection (and therefore within the scope of a consent to search), relying on *United States v. Montoya*, 731 F.2d 1369 (9th Cir. 1984), which has been overruled. *See United v. Montoya de Hernandez*, 473 U.S. 531 (1985). The Court agrees with the Magistrate that the x-ray was less intrusive than a physical search, which bears the risk of disturbing or damaging cargo. *See, e.g., United States v. Okafor*, 285 F.3d 842, 845 (9th Cir. 2002) (an x-ray examination of luggage requires no force, poses no risk to the bag's owner or to the public, and does not harm the baggage. Nor should anyone be afraid to use a suitcase merely because it has been scanned by an x-ray. X-ray examination of luggage, bags, and other containers at a border is routine and requires neither warrant nor individualized suspicion). In addition, the Court notes that at the February 15, 2012 hearing, Agent Smith testified that x-ray operators are routinely stationed at permanent immigration

checkpoints. A commercial truck driver passing through a permanent immigration checkpoint could reasonably anticipate that a search of his trailer might include an x-ray of the vehicle's contents.

Defendant also argues that the Magistrate's conclusion that Defendant was free to withdraw his consent at any time was unreasonable, given that Defendant was not present for the search and did not know that the vehicle was being x-rayed. The Court need not consider this issue, however, as it concurs with the Magistrate's conclusion that the x-ray was within the scope of Defendant's consent to the search.

## CONCLUSION

Accordingly, after an independent review of the pleadings, exhibits and transcript,

**IT IS HEREBY ORDERED** that:

1. The Report and Recommendation (Doc. 61) is **ACCEPTED AND ADOPTED** as the findings of fact and conclusions of law of this Court, with the modifications discussed in this Order;
2. Defendant's Motion to Suppress Evidence (Doc. 36) is **DENIED**;
3. This matter remains referred to Magistrate Judge D. Thomas Ferraro for all pretrial proceedings and Report and Recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) and LR Civ. 72.1(a), Rules of Practice for the United States District Court, District of Arizona (Local Rules).

DATED this 30th day of March, 2012.

_____
Jennifer G. Zipps
United States District Judge